IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO.: |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| $14,980.00 IN UNITED STATES | ) | |
| CURRENCY, | ) | |
| | ) | |
| Defendant *In Rem*. | ) | |

## UNITED STATES' COMPLAINT FOR FORFEITURE *IN REM*

The Plaintiff, United States of America, brings this complaint and alleges as follows, in accordance with Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions.

## NATURE OF THE ACTION

1.     This is a civil action *in rem* to forfeit to the United States of America funds in the amount of $14,980.00 in U.S. Currency ("Defendant Currency"), pursuant to 18 U.S.C. § §981(a)(1)(A) and 981(a)(1)(C).   The United States seeks forfeiture based upon a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Currency constitutes, or is traceable to:

    a.     proceeds of wire fraud in violation of   18 U.S.C. § 1343;

    b.     proceeds of bank fraud in violation of 18 U.S.C. § 1344;

      c.      property involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and/or § 1956(a)(1)(B)(i) and/or 1957;

      d.      property involved in an illegal money transmitting business, in violation of 18 U.S.C. § 1960;

      e.      proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956(c)(7);  and/or

      f.      proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956(h).

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355.  This Court has *in rem* jurisdiction over the Defendant Currency pursuant to:

      (a)      28 U.S.C. § 1355(b)(1)(A), because acts or omissions giving rise to the forfeiture occurred in the District of South Carolina; and

      (b)      28 U.S.C. § 1355(b)(1)(B), because venue properly lies in this district pursuant to 28 U.S.C. § 1395.

## THE DEFENDANT *IN REM*

3.      The Defendant Currency consists of $14,980.00 in United States currency seized from Kimanii Lightner ("Lightner") and Kylee Alexis Newton ("Newton"), by officers of the Greenville County Sheriff's Office ("GCSO") on October 5, 2022, in Spartanburg County, South Carolina.

4.      The seizure was adopted by the United States Homeland Security Investigations ("HSI") for federal forfeiture.   The Defendant Currency is currently on deposit in this district in an account under the control of Customs and Border Protection   ("CBP").

5.      In accordance with the provisions of 19 U.S.C. § 1606, the Defendant Currency has a total domestic value of approximately $14,980.00.

## KNOWN POTENTIAL CLAIMANTS

6.      The known individuals whose interests may be affected by this litigation are:

      a.      Kimanii Lightner, may have an interest in the Defendant Currency because she was a passenger in the vehicle from which it was seized.

      b.      Kylee Alexis Newton, may have an interest in the Defendant Currency, as she was the driver of the vehicle from which the Defendant Currency was seized and because she filed an administrative claim and petition with HSI on October 20, 2022, contesting administrative forfeiture of the Defendant Currency.

3

## BASIS FOR FORFEITURE

7.    Pursuant to the pleading requirements of Supplemental Rule G(2)(f), Plaintiff alleges that there is a factual basis to support a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Currency is subject to forfeiture to the United States, based in part upon the following:

a.    On October 5, 2022, Master Deputy Jesse Wasserman ("Wasserman") and Deputy Jacob Bembenek ("Bembenek") of the Greenville County Sheriff's Office (GCSO) were working with the Spartanburg County Sheriff's Office in Spartanburg County, South Carolina. The officers observed a blue Tesla driving in the left lane of I-85 Southbound not actively passing or overtaking any vehicles. The officers pulled over the vehicle for improper lane usage. They identified the driver to be claimant Kylee Newton ("Newton"), who was traveling with passenger Kimanii Lightener ("Lightner"). Newton's driver's license was revoked at the time. Deputy Wasserman explained why he pulled over the vehicle and asked Newton to exit the car to speak with him.

c.    HSI Special Agent (SA) Joseph Magilton ("Magilton") noticed Greenville County Sheriff's Office (GCSO) Interdiction Deputy, who is also a HSI Task Force Officer (TFO), Jesse Wasserman's unmarked Tahoe parked on the southbound lanes of Interstate 85 (I-85) on the right shoulder in the vicinity of mile marker 75. The vehicle's emergency lights were activated. SA Magilton saw that TFO Wasserman was conducting a traffic stop of a blue vehicle. SA Magilton activated

4

the emergency lights on his government owned vehicle (GOV) and pulled behind TFO Wasserman's vehicle to see if any assistance was needed.

d.      SA Magilton approached the driver's side of TFO Wasserman's vehicle and saw TFO Wasserman in the driver's seat and GCSO Deputy Jacob Bembenek was on the passenger side of the blue vehicle, later identified as a Tesla, speaking to the passenger while Newton was standing at the front of TFO Wasserman's vehicle. SA Magilton asked TFO Wasserman if assistance was needed, and he advised SA Magilton to stay because the deputies were about to conduct a probable cause search of the vehicle due to the odor of marijuana coming from the vehicle. TFO Wasserman also advised that he saw a large bundle of US Currency rubber banded together in the center console of the vehicle while the occupants were looking for the car information. SA Magilton walked over and stood by Newton.

e.      TFO Wasserman approached Newton and asked if she, or anyone, had marijuana in the vehicle because he could smell the odor of marijuana coming from it. Newton stated that neither she nor the passenger, Kimanii Lightner smoked marijuana. Newton stated that there was no marijuana in the vehicle. TFO Wasserman then approached the passenger side of the Tesla and asked Lightner to step out of the vehicle. TFO Wasserman asked Lightner if she, or anyone else, had marijuana in the vehicle and Lightner stated that she had just picked the vehicle up earlier that day. Lightner stated there was no marijuana in the vehicle and that TFO Wasserman "can feel free" as if to give permission to search the vehicle. TFO

5

Wasserman asked Lightner to step back to his vehicle with Newton. TFO Wasserman and Deputy Bembenek searched the vehicle while SA Magilton stood by Newton and Lightner at the front of TFO Wasserman's vehicle.

f.      While standing with SA Magilton, the women stated that Lightner had rented the Tesla to move her belongings from Charlotte, NC to a new residence to Atlanta, GA. The women stated that they had to meet a moving truck carrying the rest of Lightner's belongings in GA by a certain time. Newton was clearly agitated, and she repeatedly and loudly stated that there was no "weed" in the vehicle and that officers were making it up. Lightner stated she does occasionally smoke marijuana and that her roommates frequently smoked it in her Charlotte residence, but that there was no marijuana in the vehicle. SA Magilton advised that if Lightner's roommates frequently smoked marijuana in her residence that it is likely her belongings in the vehicle are what is giving off the odor of marijuana. Both women stated that their vehicle didn't smell like marijuana.

g.      During the search, a large amount of US Currency was recovered from the center console of the Tesla. Initially, Lightner stated that the US Currency was hers, but then stated that it belonged to both women. In addition to the currency, the search revealed checks drawn on Regions Bank in the name of Judy A. Hester, 2115 Louis Dr. Apt. B, Jefferson City, MO and checks/checkbook drawn on Central Bank in the name of Anthony Barbis, 201 Orleans Ct, Columbia, MO, two Visa debit cards were found. One debit card

6

was in the name of Malik Grayson and the second was in the name of Ndia White. TFO Wasserman asked who all the individuals were, and Newton stated friends they are friends of hers. Newton stated that we could call them to verify that she was allowed to have the items. Newton was asked what the telephone numbers were of the individuals and Newton stated that they were in her phone which was still in the Tesla.

h.      SA Magilton asked Newton and Lightner who the bundle of US Currency belonged to and Lightner initially stated it was hers, but then said it belonged to both her and Newton. Lightner stated that she did not like to keep large amounts of currency in a bank because she was having bank accounts closed for excessive Zelle transactions. Lightner stated that she was self-employed and owned a business called "Nyrie Extensions" that sold wigs and hair extensions. Lighter stated that there was approximately $17,000 in the bundle of money found in the center console. Lightner stated she made approximately $98,000 to $100,000 annually from her business. SA Magilton asked Lightner if she had a bank account and Lightner stated that she banked with NC State Employee's Credit Union and Wells Fargo.

i.      SA Magilton asked Lightner why she didn't keep the currency in a bank account and Lightner stated that she used to have an account with Truist Bank but had issues with them and just likes to have cash. SA Magilton asked if Lightner sells marijuana based on her early statement that she smokes it, to

7

which Lightner stated she does not sell it. SA Magilton explained that I-85 is a major corridor for the flow of narcotics and narcotics proceeds between Charlotte, NC and Atlanta, GA. SA Magilton further explained that it is unusual for someone that had bank accounts to transport large amounts of currency in a vehicle instead of keeping it safely in a bank.

j.      SA Magilton asked what the denominations of the currency were and Lightner stated that each rubber banded bundle was $1000, and the bundle contained a mixture of $100s, $20s and some $50s, but mostly $20s. Lightner was asked if she withdrew it from a bank account and Lightner stated that she did not. Lightner couldn't give a clear answer as to where the currency came from. SA Magilton asked if she had any documentation supporting her claims and Lightner stated she did. Lightner utilized her cellular phone to show SA Magilton a website she claimed showed her purchases of wigs and extensions. SA Magilton asked if she had any documentation to show withdrawals from a bank account or business transactions to support which Lightner stated that she did not. Lightner could not provide sufficient evidence that the proceeds came from a legitimate source.

k.      SA Magilton asked Newton if she had phone numbers for the individuals' names listed on the checks and debit cards. Newton stated that she did and was asked to retrieve her phone from the Tesla. After Newton retrieved her phone, TFO Wasserman asked Newton to provide a telephone number for

Anthony Barbis, a name listed on one of the checks. Newton stated she did not have a phone number for him. TFO Wasserman asked Newton to provide a phone number for Judy Hester, a name listed on another check. Newton stated she didn't have a number for Judy. Newton stated that even though the checkbook belonging to Barbis was found inside of her US Passport, she didn't have any contact information for Barbis or Hester. Newton stated she knew the checks were there, but they are not hers.

l.      At that time, based on the totality of the circumstances, SA Magilton seized the currency based on him believing it was proceeds of bank/check fraud. SA Magilton advised both Lightner and Newton that the money was going to be seized and that they would have the opportunity to petition for the funds to be returned. SA Magilton explained the petition process. Lightner became annoyed and asked how we can seize her money. SA Magilton reminded Lightner that she stated earlier that the money belonged to both women and that based on the checks/debit cards being found in the vehicle, SA Magilton believed the money to be linked to financial fraud.

m.      SA Magilton asked Newton directly if any of the money in question was hers and Newton stated that none of the money was hers. SA Magilton informed Newton that earlier Lightner stated that the money belonged to both women. Newton then stated again, adamantly, that none of the money SA Magilton had placed into an evidence bag was hers, that it belonged to Lightner. Newton became

agitated that SA Magilton was taking Lightner's money based on the checks that were in Newton's possession. Newton stated that all of her money was in Lightner's purse. SA Magilton never touched, saw or seized any currency in Lightner's purse, only the currency found in the center console. SA Magilton sealed the money, in front of both women and on camera, in a Department of Homeland Security (DHS) evidence bag, completed an Evidence Chain of Custody (6051S) and provided a copy to the women.

n.     Newton asked if she could speak with SA Magilton then Newton asked Lightner to return to the Tesla. Newton stated that she could prove that the money was actually hers and not Lightner's. Newton stated that she could show SA Magilton that the money was hers right then and there. Newton stated that she knew law enforcement would take the money because of the checks and debit cards so she said it wasn't her money. SA Magilton asked how Newton could prove the money belonged to her and not Lightner and Newton went on to her cell phone to show what appeared to be a Truist Bank banking app. On the app there appeared to be two (2) $10,000 withdrawals, but SA Magilton couldn't verify if the information was real or even linked to Newton. Newton stated that the money was going to be used to purchase a vehicle and that she was currently working as a forklift operator for Sam's Club. Newton stated that the checks found didn't belong to her and SA Magilton asked who they belonged to. Newton stated she was going to "rat" on her friend but that they were not her checks. Newton did claim ownership of the two

10

(2) debit cards. SA Magilton asked Newton for a good mailing address for petition paperwork to be sent with Newton provided. SA Magilton took possession of the checks and debit cards and placed them in an unsealed DHS evidence bag. The women were released from the traffic stop without incident

o.      On Friday October 7, 2022, SA Magilton obtained a telephone number for Anthony Barbis, one of the owners of the checks. SA Magilton called the number and a man answered. SA Magilton identified himself, asked if the man was Mr. Anthony Barbis, which he confirmed. SA Magilton explained that he was in possession of checks that contained Mr. Barbis' name and address. Mr. Barbis was a little stunned and informed SA Magilton that he was sitting in a local branch of the bank due to unauthorized withdrawals on that exact same account. Mr. Barbis stated he would call SA Magilton back after speaking with the branch manager.

p.      A short time later SA Magilton received a call from Mr. Barbis. Mr. Barbis advised that there were four (4) withdrawals from his account that were not done by him. SA Magilton sent Mr. Barbis a picture of one of the checks found in Newton's possession and Mr. Barbis confirmed the information was correct on the check, but that the picture sent was not the same style check the bank provided him with. Mr. Barbis stated that all of the checks the bank supplied for his account were in his possession. Mr. Barbis stated that he was informed that at least one of the checks was possibly used to purchase a vehicle and gave SA Magilton a contact name and number for an individual in the fraud department of the bank.

q.      On October 24, 2022, SA Magilton spoke to Keishia Richmond, Fraud & Operations Specialist with The Central Trust Bank. Ms. Richmond provided SA Magilton a copy of four (4) fraudulent checks that were cashed against Mr. Barbis' account by someone other than Mr. Barbis. The fraudulent cashed check numbers are 106, 111, 115 and 119 *(AGENT'S NOTE: The checks found in NEWTON and LIGHTNER's vehicle were numbered 102, 112, 114, 116 and 117)*. Check numbers 106, 111, and 115 were all made payable to "James Morton". Check 106 was for the amount of $4,500 and had " '98 Honda" written on the "FOR" line. Check 111 was for the amount $4350 and had " '98 Honda Civic" written on the "FOR" line. Check 115 was for the amount of $4,650 and had " '99 Camry" written on the "FOR" line. Check 119 was made payable to what appears to be "Tawna Stewart" in the amount of $984.32. The total of all four (4) checks was $14,484.32 which is only $495.68 shy of the $14,980 seized from Lightner and Newton. Also, Newton stated that the money seized was going to be used to purchase a vehicle and three (3) of the four (4) fraudulently cashed checks had vehicle information in the "FOR" line as if to be used to purchase vehicle.

r.      A final count determined that the Defendant Currency totaled $14,980.00 and was comprised of the following denominations:

- 30 one-hundred-dollar bills ($3,000)

- 40 fifty-dollar bills ($2,000)

- 499 twenty-dollar bills ($9,980)

8.    Based on the information and allegations set forth herein, there is a factual basis to support a reasonable belief that the Government will be able to meet its burden of proof at trial to show that the Defendant Currency constitutes, or is traceable to:

   a.    proceeds of wire fraud in violation of  18 U.S.C. § 1343;

   b.    proceeds of bank fraud in violation of 18 U.S.C. § 1344;

   c.    property involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and/or § 1956(a)(1)(B)(i) and/or 1957;

   d.    property involved in an illegal money transmitting business, in violation of 18 U.S.C. § 1960;

   e.    proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956(c)(7);  and/or

   f.    proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956(h).

## CONCLUSION

10.    By reason of these premises, and pursuant to 18 U.S.C. § 981(f) and 21 U.S.C. § 881(h), whereby the Plaintiff's right, title and interest in and to the Defendant Currency relates back to the commission of the act giving rise to the forfeiture, the Defendant Currency has become and is forfeited to the United States of America, to be disposed of pursuant to Supplemental Rule G(7)( c) for Admiralty or Maritime Claims and Asset Forfeiture Actions, 18 U.S.C. § 981(d), 21 U.S.C. § 881(e), and other applicable laws.

13

WHEREFORE, Plaintiff prays that due process issue to enforce the forfeiture of the Defendant Currency, *in rem*; that a Warrant for the Arrest of the Defendant Currency be issued; that due Notice be given to all interested persons to appear, make claim, answer and show cause why the forfeiture should not be decreed; that the Defendant Currency be decreed condemned and forfeited to the United States of America for disposition according to law; and that Plaintiff have such other and further relief as the Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

By:   *s/Carrie Fisher Sherard*
Carrie Fisher Sherard #10134
Assistant United States Attorney
55 Beattie Place, Suite 700
Greenville, SC 29601
(864) 282-2100